# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs February 5, 2014

## STATE OF TENNESSEE v. BRANDON HARRIS

**Appeal from the Criminal Court for Shelby County**
**No. 10-01849      Lee V. Coffee, Judge**

---

**No. W2012-02574-CCA-R3-CD  - Filed June 19, 2014**

---

The defendant, Brandon Harris, was convicted by a Shelby County Criminal Court jury of especially aggravated robbery, a Class A felony; reckless endangerment, a Class A misdemeanor; and three counts of assault, Class A misdemeanors.  He was sentenced to twenty-five years for the especially aggravated robbery conviction and eleven months and twenty-nine days for the reckless endangerment and each of the three assault convictions. All of the sentences were ordered to be served consecutively for an effective term of twenty-eight years, eleven months, and twenty-five days in the Tennessee Department of Correction. On appeal, the defendant argues that:  (1) the trial court erred in allowing a voice recognition "expert" to testify; (2) the trial court erred in denying his request for a jury instruction regarding mere presence; (3) the evidence is insufficient to sustain his convictions; and (4) the trial court erred in imposing excessive and consecutive sentences.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Juni S. Ganguli (on appeal) and Randall B. Tolley (at trial), Memphis, Tennessee, for the appellant, Brandon Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Amy P. Weirich, District Attorney General; and Pamela Fleming and Steve Crossnoe, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was charged with especially aggravated robbery, attempted second degree murder, and three counts of aggravated assault arising out of his involvement in a robbery and shooting at a home in Memphis, Tennessee.

**State's Proof**

At trial, Michael Reynolds testified that on November 21, 2008, he was with Johnnie Morgan, and twins, Antonio and Antoine Hawkins,[1] in a home they rented on Pope Street in Memphis. Around 8:30 or 9:00 p.m., Reynolds was in the living room in the front of the house, Morgan was in the kitchen, and Antonio and Antoine were in a room in the back of the house. Someone knocked on the door and, when Reynolds looked outside, he vaguely recognized the men standing there but did not know them. He asked Antonio to come to the door and Antonio, appearing to recognize the men, let the two inside.

Reynolds recalled that Antonio and one of the men walked to the back of the house, while the other man stayed in the living room with Reynolds. Three to five minutes later, Reynolds heard gunshots coming from the back of the house. The man with Reynolds in the living room pulled out a gun and told Reynolds to lie down and not move. Reynolds complied and then heard gunshots. The man dragged Reynolds into a room between the living room and kitchen. Reynolds saw Antonio run from the back of the house. The man who had been watching Reynolds went to the front door and let another man inside. Reynolds heard either the man watching him or the one who just entered the house tell Antonio to "[g]et back in there[.]" One of the men left the house. Reynolds said that he felt it was safe to get up off the floor once he heard Antonio moving around the house without being reprimanded.

Reynolds testified that, altogether, he heard two or three gunshots. He saw an injured Antoine lying by the couch in the back room of the house. He went to the police station the day after the incident and identified the defendant from a photographic array. Reynolds also identified the defendant in court as the man who entered his house, walked into the back room with Antonio, and was in the back room when Reynolds heard the gunshots. Reynolds said that he had no doubt that the defendant was the person he saw go in the back room with Antonio. Reynolds acknowledged that he told the police that he did not want to prosecute this matter but explained that he "was just feeling kind of uncomfortable, kind of scared."

On cross-examination, Reynolds admitted that he did not see the shooting take place. Reynolds recalled that when Antonio originally let the two men into the house, the three of

---

[1] Because the twins share the same last name and first initial, we will refer to them by first name. We mean no disrespect by the practice.

them discussed going to a club. Reynolds saw a white Dodge Charger flee the scene.

Johnnie Morgan testified that he was also at the residence on Pope Street the night of the incident. Morgan was playing a video game in the room between the living room and the kitchen, Reynolds was in the living room at the front of the house, and Antonio and Antoine Hawkins were in the back room. Two men, one of whom was identified as the defendant, knocked on the door. Morgan went with Reynolds to see who was at the door, and Antonio came to the front room and, apparently recognizing them, let the two men inside. Antonio and the two men discussed going to a club, and Antonio asked them to wait in the front room of the house. Antonio started walking toward the back of the house, as did Morgan, and the defendant followed behind them. Antonio sat down on a couch in the back room, and Morgan stopped in the kitchen to prevent the defendant from walking into the back room, as Antonio had asked the defendant to wait in the living room. However, about that time, the other man who had arrived with the defendant held a pistol over Morgan's head and said, "Get down. You know what this is." Antonio took off running another way toward the front of the house, and the other man went back toward the front of the house to head off Antonio. The defendant walked into the back room and started shooting at Antoine.

Morgan testified that the defendant shot Antoine three times, the first hitting him in the stomach. After the first shot, Antoine fell down and started screaming, "Just take it. Just take it." The defendant rummaged through Antoine's pockets and said, "Where the rest of it at, bitch?" and smacked him across the head with the pistol. The defendant took Antoine's money and watch and, as he was leaving, turned around and shot Antoine again. The defendant looked over at Morgan on his way out, making Morgan fearful for his life, but left Morgan unharmed. Antonio came back into the room from the other side of the house and attempted to pursue the defendant. Morgan stayed with Antoine and called 911. Morgan gave a statement to the police and, the day after the incident, identified the defendant as the person who shot Antoine from a photographic array.

On cross-examination, Morgan said that his "eyes w[ere] glued on [the defendant]" during the shooting. Morgan acknowledged that he told the police that a person named Derrick Dowdy had been driving the white Dodge Charger in the neighborhood on many occasions leading up to the incident. Morgan stated that, when talking to the police after the incident, he believed that he referred to the defendant as "suspect number two." Morgan said that he did not know why he wrote, "Shot number two" on the photograph of the defendant that he identified for police.

Antoine Hawkins testified that he was the twin brother of Antonio Hawkins, who was killed in an unrelated incident two years before trial. On the night of the incident, he, Antonio, Johnnie Morgan, and Michael Reynolds were at the residence on Pope Street.

Antoine was in the back room studying and was not aware that anyone had come to the house until he saw Antonio run past him with a frightened look on his face. He called out to Antonio, asking what was wrong. However, before Antonio could answer, a man, later identified as the defendant, entered the room and shot Antoine in the stomach. The defendant approached Antoine and, with gun still in hand, started rummaging through his pockets. The defendant said to Antoine, "I know you got more than that" and struck him on the head with the gun. Antoine told the defendant that he did not have anything else, but the defendant insisted, "I know you got more than that," and continued to strike him with the gun. The defendant took Antoine's money, watch, and cell phone and began to walk away. He then stopped, turned around, and fired a shot toward Antoine's head. Antoine threw his hands up to shield his head.

Antoine testified that he was taken to the hospital, where he stayed for a week and a half. Doctors removed a portion of his intestines, and it took him a month to recover after leaving the hospital. His sister stayed with him during his recovery because he was unable to care for himself. The shooting left him with scars on his stomach and arm. The police showed Antoine a photographic array the day after the shooting while he was in the hospital, from which he identified the defendant. Antoine stated that he had no doubt that the defendant was the person who shot him.

On cross-examination, Antoine stated that only he, the defendant, and Morgan were present when he was shot. He did not see another individual put a gun over Morgan's head or hear anyone say, "You know what this is. Get down." Antoine acknowledged that he gave a statement to police almost a month after the shooting, at which point he identified the defendant as the shooter by name from "[f]olks . . . just taking about it." However, he pointed out that he identified a photograph of the defendant as the shooter the day after the shooting. Antoine acknowledged that he could not describe what the defendant was wearing the night of the incident.

On redirect examination, Antoine testified that a co-defendant, Tyrone Bohanna, contacted him from the jail. During that telephone call, Antoine remarked that he was certain that it was the defendant who had shot him.

Susanna Shea, a prosecutor who was assigned to Shelby County General Sessions Court in January 2009, testified that she represented the State at the preliminary hearing of this case and identified a taped copy of the hearing. Shea also discussed the process she used to interview witnesses before hearings. She said that, at the preliminary hearing, the witnesses did not have an opportunity to hear the other witnesses' testimony before testifying.

-4-

The tape of the preliminary hearing conducted in the case was played for the jury and a transcript of such entered into evidence.

Sergeant Robert Tutt with the Memphis Police Department testified that he responded to the scene at 1681 Pope Street. Patrol officers were already on the scene, and paramedics had transported Antoine to the hospital. Sergeant Tutt spoke with Antonio, who told him that the defendant and Tyrone Bohanna were the two men he let into his home earlier in the evening. Antonio told Sergeant Tutt that he met the two men through a mutual friend and knew them from different clubs. Antonio stated that the men fled the scene in a late model white Dodge Charger that was stolen and used as a "community car"[2] in the neighborhood. Antonio also told him that both men were armed. Johnnie Morgan gave Sergeant Tutt a description of the suspects that matched the description given by Antonio.

Sergeant Tutt stated that no guns or weapons were recovered from the house. A spent nine-millimeter shell casing was recovered from the scene, but Sergeant Tutt did not know whether any ballistics tests were conducted on it. He was also unaware whether the casing was compared to any bullet fragments that might have been recovered from Antoine's wounds. Sergeant Tutt's involvement in the case ended after the first few hours.

Officer Billy Jackson with the Memphis Police Department's Organized Crime Unit testified that he reviewed suspects that were listed on the police report in this case and recognized the nicknames "T.Y." and "Little B." Officer Jackson knew the nicknames to correspond to Tyrone Bohanna and the defendant, respectively. Officer Jackson located and arrested Bohanna, from whom he learned the defendant's location. The defendant was subsequently taken into custody. An individual named Derrick Dowdy was also arrested because Dowdy had been selling items taken in an unrelated burglary in which the white Dodge Charger was also used. Officer Jackson stated that police also suspected that Eric Walker, known as "Hot Boy," was involved in the crime.

Juaquatta Harris testified that she was responsible for monitoring jail inmate phone calls for the Shelby County Sheriff's Office. She explained that inmates were given a unique record identification ("R&I") number that was used to track the inmate's calls. All inmate calls were recorded. A CD of phone calls placed by the defendant was admitted as an exhibit and played for the jury.

Harris admitted there was a problem in the jail with inmates allowing other inmates to use their R&I number. Asked if she used any "voice recognition" in identifying the

_____

[2] Sergeant Tutt explained that a community car is a "stolen [car] that would be in the neighborhood that people just use till somebody gets caught in it."

defendant's calls, Harris stated that she recognized the defendant's voice. However, she acknowledged that she had never had a conversation with the defendant but explained that she used "voice recognition" in the sense that the defendant or someone else may have said the defendant's name in the call, or he may have "talked about his cases, courts, co-defendants, relatives." Harris stated that she sometimes compared the voices on a call with other inmates' voices because inmates' voices could sound similar.

## Defendant's Proof

Mario Teal testified that he was at the defendant's house when the defendant was taken to the police department for questioning on November 23, 2008. He said that the defendant did not attempt to run from the police.

Gwendolyn Mitchell testified that she owned a white Dodge Charger in 2008. Her son was carjacked, and the robbers took off with the car. Sometime after that, Mitchell was informed that her vehicle was involved in a robbery, and she ultimately got her car back about a month later.

Lieutenant Christopher Kee of the Memphis Police Department testified that he was the lead investigator in the defendant's case. Lieutenant Kee spoke to Antoine at the hospital. Antoine identified the defendant as one of the robbers but did not identify him as the shooter. Antoine told Lieutenant Kee that everything happened so fast he was not sure which suspect shot him. The defendant, Tyrone Bohanna, Eric Walker, and Jacob Halliburton were developed as suspects. However, none of the victims could identify Walker or Halliburton from a photographic array, so they were not charged. The third perpetrator involved in the case, possibly an individual known as "Little Jake," was never identified. Lieutenant Kee stated that he did not take a formal statement from Antoine while he was in the hospital because he had just gotten out of surgery and was in a lot of pain.

The defendant testified that, on the night of the incident, he and a friend, "P.J.," were "riding around through the neighborhood" when they saw Jacob Halliburton and Eric Walker in a white Dodge Charger. The defendant went with Halliburton and Walker to the home of Antonio and Antoine Hawkins to buy cocaine. The defendant knocked on the door, and Antonio let him and Walker into the house. The defendant followed Antonio to a room in the back of the house where Antoine was sitting down at a table "breaking [cocaine and marijuana] down on the scales." Antonio went to the other side of the house to retrieve some cocaine, but then the defendant heard a gunshot from the front of the house and Antonio came running in his direction being chased by Walker. The defendant claimed that Walker pushed him out of the way and shot Antoine. After he shot Antoine, Walker asked Antoine where the rest of the drugs were located.

-6-

The defendant denied having a gun and alleged that he told Walker not to shoot Antoine again. He said that Walker shot Antoine again before pointing the gun at the defendant and escorting him out of the house. The defendant stated that he never intended to rob or shoot anyone and was not part of any plan to do so. The defendant claimed that, once back in the car, Walker threatened the defendant and his family if the defendant talked about what had taken place. The defendant said that, after the shooting, he was afraid that Antonio would attack him in retaliation for the shooting of Antoine due to Antonio's belief that the defendant had set them up with Walker. He stated that he cooperated with the police when they took him into custody. He denied ever having been shot in the arm or having a cast on his arm.

On cross-examination, the defendant denied "hanging out" with Halliburton and Walker, insisting that he merely knew them from school. He also said that he was not friends with Antonio or Antoine Hawkins but that his friend, P.J., was friends with them, and the defendant took people to purchase drugs from them. The defendant stated that he went with Halliburton and Walker to the Hawkinses' house because the Hawkinses did not know Walker and would not sell drugs to him if the defendant did not accompany him. Asked how the twins would not be able to recognize Walker despite having allegedly put out a "hit" on him previously, the defendant said that his knowledge of the alleged hit was second-hand and he did not know whether it was true. The defendant admitted that he rode to and from the Hawkinses' house in a white Dodge Charger.

The defendant testified that Walker did not take Antonio's money, watch, or cell phone or hit him in the head with a gun. However, Walker grabbed the drugs that were lying on the table. The defendant said that the only gun he saw in the house that night was Walker's. He claimed that, even though it was a known drug house, no one there drew a weapon and tried to defend themselves. The defendant admitted that, despite his claims of fearing reprisal from Antonio, he went to the grocery store to buy cigarettes for his mother and picked up food for his brother the same night after the shooting.

The defendant admitted that it was his voice on the phone calls recorded from jail. He agreed that, in one of the calls, he claimed that the police officers circled a photograph of him in an effort to make him believe that the person who had been shot had identified him. The defendant insisted that the police circled the photograph of him. The defendant acknowledged that he was not home all day on the day of the shooting, despite his mother indicating in a phone call that she told the police that he was at home all day. He also acknowledged that he told his mother in that phone call that they needed to find more witnesses to say that he was at home. However, he explained that he was not talking about getting witnesses to testify about his whereabouts during the time period of the shooting.

-7-

The defendant conceded that, during a phone call with his brother, he told his brother that he suspected a woman named Dominique of "informing" on him to the police. He said that he had not told Dominique anything about the offense but that she might have "hear[d] stuff through the neighborhood." He acknowledged telling his brother that he would "beat that bitch" if she "lied on" him. The defendant denied that his tattoos were references to a gang affiliation, explaining that two were in memory of deceased loved ones and another was in the style of rapper Lil Wayne. The defendant said that he was no longer a member of the Vice Lords gang and was not active in the gang when the shooting took place. He stated that he "gave [him]self to God."

**Rebuttal Proof**

Deputy Keeley Gray with the Shelby County Sheriff's Office Gang Unit testified that he interviewed the defendant when he was brought into the jail, and the defendant told him that he was an active member of the Vice Lords gang. The defendant indicated that he had achieved the rank of "three-star universal elite," which was a high ranking in the gang. The defendant told him that he was in the gang for life.

Following the conclusion of the proof, the jury convicted the defendant of especially aggravated robbery as charged in the indictment; reckless endangerment as included in the indictment; and three counts of assault as included in the indictment.

## Sentencing Hearing

The trial court conducted a sentencing hearing, at which the defendant made a statement of allocution asking the court for leniency, claiming he was "just at the wrong place at the wrong time." After reviewing the sentencing guidelines and information it considered, the trial court enhanced the defendant's sentence based on a finding that the defendant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish his range and that the defendant was a leader in the commission of an offense involving two or more criminal actors. See Tenn. Code Ann. § 40-35-114(1), (2). The court additionally enhanced the defendant's sentences for all but his especially aggravated robbery conviction on a finding that the defendant possessed a firearm during the commission of the offenses. See id. § 40-35-114(9). As for mitigating factors, the court found that the majority of the mitigating factors argued by the defendant were not applicable. However, the court gave slight weight to the defendant's having a mental condition and that, according to the defendant's testimony, he was acting under the duress or domination of another person. See id. § 40-35-113(8), (12). The court also noted in mitigation that the defendant had the support of family members and members of the community. See id. § 40-35-113(13). Accordingly, the court imposed a sentence of twenty-five years on the especially

aggravated robbery conviction and sentences of eleven months and twenty-nine days on the reckless endangerment and each of the three assault convictions. The court ordered that all of the defendant's sentences be served consecutively, for an effective sentence of twenty-eight years, eleven months, and twenty-five days, based on a finding that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See id. § 40-35-115(4).

## ANALYSIS

### I.  Voice Recognition "Expert"

The defendant argues that the trial court erred in allowing Juaquatta Harris to testify regarding the recordings of his phone calls from jail because the State did not qualify her as an expert and she did not have the necessary expertise to testify as she did. The State responds that the defendant has waived this issue by failing to object on the same grounds at trial and that the trial court, nevertheless, acted properly within its discretion in allowing Harris' testimony.

The record shows that the defendant objected to Harris' testimony at trial on grounds that the State failed to disclose her as a witness during discovery, a claim the trial court resolved in favor of the State. Later, when admitting a recording of the defendant's jailhouse phone calls, the trial court asked the defendant whether he had any additional objections, and he did not. The defendant did not make an objection to Harris' testimony on the grounds that she was not properly qualified as an expert witness. "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." State v. Alder, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) (citing State v. Banes, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993)).

Waiver notwithstanding, any error in the trial court's allowing Harris to identify the defendant as the speaker on the jailhouse telephone calls is harmless because the defendant readily admitted under cross-examination at trial that it was his voice on the calls.

### II.  Jury Instruction

The defendant argues that the trial court erred in denying his requested jury instruction on "mere presence."

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the

jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)).  Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)).  An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).  A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law.  State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001).

The record shows that the defendant requested that the trial court modify the pattern instruction on criminal responsibility to indicate that mere presence during the commission of a crime is not enough to convict.  The court determined that the pattern charge detailed that a person had to act with the intent to commit, promote, or assist in the commission of a crime, which required more than just being merely present.  The court found that the addition of other language, taken from case law, would not assist and could possibly confuse the jury. The court concluded that "the instruction on criminal responsibility is as succinct and as user-friendly as any instruction that we have in the pattern instructions."  Accordingly, the trial court "decline[d] the request to modify the instructions because it does not really add anything to the instructions . . . [and] would make those instructions more difficult to understand."

Thereafter, when it charged the jury, the trial court included the following pattern charge on criminal responsibility, which tracked the statutory language:

> The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

> A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

-10-

Before you find the defendant guilty of being criminally responsible for said offenses committed by the conduct of another, you must find that all the essential elements of said offenses have been proven by the State beyond a reasonable doubt.

The defendant concedes that this court has approved this pattern jury instruction on criminal responsibility as "a correct statement of the law." See State v. Mario Green, No. W2006-01383-CCA-R3-CD, 2008 WL 2331020, at *7 (Tenn. Crim. App. June 5, 2008), perm. app. denied (Tenn. Dec. 22, 2008). However, he asserts that the instruction is not a complete charge of the law because it did not include an instruction regarding mere presence. The trial court found that the principle of mere presence is inherent in the language of the statute as it premises criminal responsibility on the defendant's intent and not his presence. This court has previously denied such claim of error in a trial court's declining to include a charge on mere presence in its jury instructions, see State v. Christopher Bryan Hancock, No. E2011-00111-CCA-R3-CD, 2012 WL 4340693, at *10 (Tenn. Crim. App. Sept. 24, 2012), noting that "a trial court is not required to define or explain words or terms in common use which are understood by persons of ordinary intelligence." Id. (citing State v. Summers, 692 S.W.2d 439, 445 (Tenn. Crim. App. 1985); State v. Terrance D. Nichols, No. W2003-01043-CCA-R3-CD, 2005 WL 551957, at *3 (Tenn. Crim. App. Mar. 8, 2005)). We conclude that the trial court properly instructed the jury.

### III. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence convicting him of especially aggravated robbery, reckless endangerment, and assault. He does not dispute that the elements of the offenses were established, only the sufficiency of the evidence establishing his identity as the perpetrator.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In the light most favorable to the State, the evidence shows that two eyewitnesses, the victim Antoine Hawkins and Johnnie Morgan, identified the defendant as the person who shot and robbed Antoine Hawkins. A third eyewitness, Michael Reynolds, identified the defendant as the person he saw enter the house with another man and walk to the room where the shooting took place moments before the shooting started. The defendant argues that this court should discredit the testimony of the State's witnesses and accredit his own testimony, essentially that he was an innocent bystander, over that of the State's witnesses. However, "[i]dentification of a defendant as the person who committed the offense for which he or she is on trial is a question of fact for the jury's determination upon consideration of all

competent proof." State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)). The jury assessed the credibility of the witnesses, and we will not second-guess the jury's determination. The victim and another eyewitness testified that the defendant was the perpetrator of the offenses for which he was convicted, and another eyewitness placed him at the scene of the crimes. The evidence is sufficient for a rational trier of fact to find that the defendant was the perpetrator of the offenses.

## IV. Sentencing

The defendant lastly challenges the sentences imposed by the trial court. He argues that the trial court imposed excessive sentences, in that he received the maximum sentence for each offense, and erroneously found that he was a dangerous offender for purposes of ordering consecutive sentences.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors,

-13-

and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

The trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in the Tennessee Code Annotated section 40-35-115(b) apply, including that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Id. § 40-35-115(b)(4). When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence was necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). As to consecutive sentencing, our standard of review is abuse of discretion with a presumption of reasonableness. State v. Pollard, --- S.W.3d --- (Tenn. 2013).

The trial court enhanced the defendant's sentence based on a finding that the defendant had a previous history of criminal convictions or criminal behavior in addition to that necessary to establish his range. See Tenn. Code Ann. § 40-35-114(1). The court based this determination on the defendant's having a prior theft conviction, admitted drug use, being an intermediary in a number of drug sales, and involvement in a gang. The court also enhanced the defendant's sentence based on a finding that the defendant was a leader in the commission of an offense involving two or more criminal actors. See id. § 40-35-114(2). The court based this determination on evidence that "[b]ut for the fact that [the defendant] was able to get entrance into that house because they knew him, the other people, . . . would have never been in that house and this crime would have never happened." The court additionally recalled the proof that the defendant personally shot Antoine and took belongings from him before shooting him again. Also, recalling proof from trial that the defendant had a gun which he used to shoot Antoine, the court enhanced the defendant's sentences for all but his especially aggravated robbery conviction on a finding that the defendant possessed a firearm during the commission of the offenses. See id. § 40-35-114(9). The court gave great weight to all of the enhancement factors.

The trial court noted in mitigation that the defendant had a mental condition; that, according to the defendant's testimony, he was acting under the duress or domination of another person; and that he had the support of family members and members of the

community. See id. § 40-35-113(8), (12), (13). However, the court determined that the defendant's mental condition and claim of duress or domination were entitled to only slight weight and that the defendant's having the support of family members and members of the community was entitled to some weight. However, the court concluded that the enhancement factors outweighed the mitigating factors.

In determining that the defendant's sentences should be served consecutively, the trial court found:

> As far as consecutive sentencing, the State has asked the [c]ourt to find that [the defendant] is a dangerous offender whose behavior indicates little or no regard for human life and who had no hesitation about committing a crime in which the risk to human life was high and that the following factors applied: that the circumstances surrounding the commission of the offense are aggravated and that the aggregate length of the sentences reasonably relates to the severity of the offense for which the [d]efendant stands convicted and are necessary in order to protect the public from further criminal acts by the [d]efendant.
>
> Those are findings that the [c]ourt has to make pursuant to State versus Wilkerson . . . .
>
> . . . .
>
> . . . [T]his [c]ourt does find that [the defendant] is a dangerous offender whose behavior indicated little or no regard for human life and he had no hesitation in committing a crime in which the risk to human life was, in fact, high.
>
> Again, this was a home invasion in which [the defendant] facilitated the entry into this house, and once this house . . . was entered, . . . [the defendant] used his familiarity, the fact that he went clubbing with Mr. Antonio Hawkins to pull a gun, to get these people comfortable, pull a gun, demand money, take property, shoot Mr. Hawkins in his gut, and but by the grace of God and the great work by the Regional Medical Center of Memphis, this would have, in fact, been a homicide, and he took property from these folks after he had, in fact, shot these people, and this [c]ourt does find that he is, in fact, a dangerous offender who, in his behavior, shows absolutely no respect for human life.

This [c]ourt, in making a determination as to whether or not he's a dangerous offender and making a determination as to whether or not these sentences shall be served consecutive or concurrent, the [c]ourt can . . . base enhancement factors for consecutive sentence on the underlying facts of the offense for which a defendant . . . has been convicted, and under State versus Winfield, . . . even if the [d]efendant has been acquitted . . . of certain offenses or certain charges, the [c]ourt is still allowed to consider the underlying facts if the [c]ourt finds by a preponderance of the evidence that those factors and that those facts, in fact, do exist. When a jury finds the [d]efendant not guilty or finds him guilty of a lesser-included offense, that finding is made on the standard of beyond a reasonable doubt, and the Winfield [opinion] would indicate that the [c]ourt has to look at a preponderance of the evidence to see whether or not those facts have, in fact, been proved in this case.

And this [c]ourt finds by a preponderance of the evidence that -- and this is not a quarrel with the jury's verdict -- but by a preponderance of the evidence, the [c]ourt finds that this [d]efendant did . . . invade a house, he had a gun, he shot, that he, in fact, did . . . try to kill . . . Antoine Hawkins . . . and . . . but for great medical treatment, Mr. Hawkins would be dead, and this [c]ourt also finds by a preponderance of evidence that [the defendant] and others, Mr. Bohanna, did, in fact, commit assaults against Mr. Morgan, Mr. Reynolds, Mr. Antonio Hawkins, by using [a] deadly weapon.

And again, I do not quarrel with the verdict that the jury reached in this case when they found this [d]efendant guilty of an included offense of assault when they that [sic] on the basis of proof beyond a reasonable doubt, but the [c]ourt has to consider proof by a preponderance of the evidence in a sentencing hearing and in making a determination as to whether or not these sentences shall be served consecutive or concurrent, and this [c]ourt finds for those reasons as stated that this is a dangerous offender, that the circumstances surrounding the offense are, in fact, aggravated.

The record reflects that the trial court stated its reasons for the length of sentences imposed and made the requisite findings in support of consecutive sentencing. Again, our standard of review is abuse of discretion with a presumption of reasonableness. After review, we conclude that the record supports the trial court's sentencing determinations.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE